# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

GREAT SOUTHERN BANK,

         *Plaintiff*,

v.                                       Civil Action No.

FISERV SOLUTIONS, LLC,

         *Defendant*.

## COMPLAINT

1.     Plaintiff Great Southern Bank ("GSB") brings this action to recover damages caused by Defendant Fiserv Solutions, LLC's ("Fiserv") material breach of its Master Agreement with GSB, Fiserv's fraudulent misrepresentations and omissions, and for declaratory relief.

**I.     Introduction**

2.     A bank's core processing system is its central nervous system, and it serves as the bank's primary financial system of record and transaction processing. As such, a core processing system must provide the bank with the ability to meet regulatory compliance, make data-driven decisions with accurate and reliable data analytics and reporting via predefined and ad-hoc reports, enable employees to efficiently do their jobs, and ensure customers' banking needs are met.

3.     In 2020, GSB began to consider the benefits of upgrading to a new core processing system.

4.     GSB relies on numerous reports and exports of data for its daily operations and for required committee, board, and regulatory reporting. Accordingly, GSB required a comprehensive data analytics and data warehouse solution that could incorporate data from both the core system

Case 6:24-cv-03118-BCW   Document 1   Filed 04/24/24   Page 1 of 62

and ancillary systems to effectively and efficiently provide the necessary ad-hoc and critical reports as well as additional insights to data. This was noted as a Chief Criteria in GSB's Request for Proposal ("RFP") sent to potential new core providers.

5.      GSB also required the conversion of several existing ad-hoc reports and queries used by GSB for Regulatory reporting and other critical processes. This was included as a Chief Criteria in the RFP.

6.      GSB required a modern and efficient user interface for all associates, including an intuitive and streamlined user interface for front-line retail associates (tellers, personal bankers, managers, and sales associates who work with customers directly) to optimize customer onboarding and support, and with the ability to keep current with modern technology such as personal computers, tablets, smartphones, and internet browsers. This was included as a Chief Criteria in the RFP.

7.      GSB required a complete and methodical employee training program so that all employees had adequate training and experience to ensure an acceptable amount of risk during the conversion process and at go-live. This was extremely critical considering that GSB had been with its current core processing provider for over 25 years. This was noted as a Chief Criteria in the RFP.

8.      GSB required well-tested and fully functional products and solutions. GSB did not want any products or solutions that were not in general use.

9.      GSB performed due diligence on several core processing providers over a period of 10 months. This due diligence included issuing a RFP, receiving and carefully reviewing RFP responses, attending multiple sales presentations, and scheduling product deep dive sessions.

2

10.     On July 9, 2020, Fiserv responded to GSB's RFP.  Fiserv promised a state-of-the-art core processing system, including (1) a modern user interface that would allow GSB associates to access information and use different functionalities of the core processing system and (2) a robust data warehouse with sophisticated report-writing capabilities.

11.     Throughout the due diligence process, Fiserv represented to GSB that the entire core processing conversion would take eighteen (18) months.

12.     This representation was material to GSB, as it would need to plan the end of its relationship with its existing core provider and multiple third party service providers and notify its customers of the change.

13.     Fiserv represented that all of its products and services had been fully tested and were generally available to its clients, and that custom integrations required to support the GSB conversion and/or GSB's use of those products would be fully tested and generally available for GSB to incorporate into user acceptance testing and to train GSB's associates on said products ahead of the scheduled conversion.

14.     Fiserv represented that its core processing system, along with the majority of its products and software represented in the Master Agreement and related schedules, could be hosted in-house at GSB.

15.     This was important to GSB, because an in-house model would allow GSB to continue to maintain a high level of confidentiality, integrity, and availability of its data and information as had been done for at least twenty-five years with the current in-house model.

16.     Based on Fiserv's representations and promises, GSB focused its attention on a potential conversion to Fiserv's core processing system.

CORE/0838898.0039/188919190.1

17.     On May 3, 2021, GSB executed a Letter of Engagement ("LOE") with Fiserv that allowed the parties to investigate how Fiserv's products fit with GSB's operational needs and what customizations would be required.

18.     Core processing systems are not out-of-the-box products. Conversion to a new system is an iterative process, and was always intended to be a collaborative effort between Fiserv and GSB to identify which functions would be available out of the box, and which functions would require customizations to meet GSB's operational needs.

19.     As Fiserv CEO Frank Bisignano explained to GSB President and CEO Joseph Turner, all banks operate differently, and Fiserv knew that modifications of Fiserv's products would be required during the conversion process.  Mr. Bisignano stated that modifications are part of Fiserv's job, and they expect to do them and do them well.

20.     Fiserv performed additional due diligence concerning the GSB conversion after signing the LOE, including the performance of an exercise to ensure they could meet GSB's operational needs.

21.     On December 28, 2021, the parties executed a Master Agreement to convert to Fiserv's core processing system, referred to as "DNA", which would become the backbone of GSB's banking operations.

22.     The Master Agreement also covered multiple required surround systems, integrations, and software solutions that would interact with DNA and go live at the same time. These additional items were critical to GSB's operations and the support of its customers.

23.     A material term of the Master Agreement was Fiserv's commitment that the go-live date would "occur prior to the end of August 2023."

24.     On March 30, 2022, Fiserv held an "Executive" kick-off meeting in Springfield, Missouri.  At that kick-off meeting, Fiserv announced that the DNA conversion would go-live on August 14, 2023.

25.     Fiserv failed to complete the DNA conversion by August 14, 2023.

26.     This was not a near miss of the go-live date Fiserv promised.  Its own data revealed that, as of the week following the promised go-live date, only 41% of Fiserv's tasks required for conversion had been completed.

27.     Fiserv's inability to complete the conversion by August 14, 2023 was caused in part by its failure to fulfill its contractual obligation to fully staff the project with well-qualified individuals who are knowledgeable in conversion engagements.  Work on the conversion project lagged because critical Fiserv positions went unfilled for months.

28.     Fiserv's employee turnover (over 35 different Fiserv employees have left the GSB project) created serious continuity issues from repeated personnel changes to critical roles.

29.     Fiserv's inability to complete the conversion by August 14, 2023 was caused in part by its inability to provide contracted-for products and solutions.

30.     When it was evident that Fiserv would miss the August 2023 go-live deadline, Fiserv committed to complete the DNA conversion by May 27, 2024.

31.     After months of continued lack of progress, GSB provided Fiserv with a notice and cure letter on September 1, 2023, detailing Fiserv's material breaches of the Master Agreement.

32.     Fiserv did not contest GSB's detailed summary of its nonperformance, but questioned the materiality of its nonperformance.

5

33.    On January 11, 2024, Fiserv had not cured its material breaches, and admitted to GSB, both in writing and in a meeting, that there was an unacceptable amount of risk to go-live in May 2024.

34.    On January 24, 2024, Fiserv provided GSB with a list of items that it would be unable to provide to GSB, regardless of the go-live date.  This list included several items that Fiserv had expressly agreed to provide in the Master Agreement, and that Fiserv had represented were generally available to clients prior to the execution of the Master Agreement.

35.    On February 9, 2024, Fiserv declared that it may not troubleshoot issues identified by GSB after January 17, 2024 even though Fiserv had not delivered all contracted products and services.  Thus, GSB would not be guaranteed an opportunity to address errors that may come up during testing of the undelivered solutions.

36.    Fiserv's inability to perform a timely conversion was not its only material breach of the Master Agreement.

37.    On January 25, 2024, a Fiserv employee admitted in a meeting with GSB that the Fiserv sales team often includes products / solutions / functionality in contracts even if the sales team has no idea if such product / solution / functionality will be available at the go-live date.

38.    That has been GSB's experience in the agreement with Fiserv.

39.    Despite representing during the RFP process in 2020 that all of its products and solutions were fully tested and generally available to clients, nearly four years later, several of these same products and solutions are still under development or remain purely aspirational.

40.    For example, Fiserv promised that its DNA core processing system had a modern, fully-functional user interface ("UX") for use by GSB's retail associates as included in screenshots

in Fiserv's RFP response and as demonstrated during the sales process and subsequent presentations.

41.     Only after signing the Master Agreement and several months into project implementation did GSB learn that UX was not the default user interface for DNA.

42.     One of GSB's prerequisites for a core processing system was the ability to scan items into the system at the teller level (called "teller capture"). To induce GSB to purchase the DNA system, Fiserv represented that its solution, called tMagic, would allow for teller capture. Fiserv represented that UX was compatible with tMagic.

43.     As of the filing of this lawsuit, the UX provided by Fiserv lacks the promised functionality, and is unstable, unreliable, and will not support GSB front-line daily needs.

44.     Additionally, Fiserv has failed to provide GSB with a functioning UX system integrated with tMagic that allows for teller capture.

45.     Upon information and belief, as of December 31, 2023, nearly three and a half years after representing that UX was in production, Fiserv had not completed a DNA conversion with DNA UX as the user interface at any bank.

46.     To satisfy one of GSB's "Chief Criteria," Fiserv repeatedly represented during the RFP process that it could provide GSB with an in-house data analytics and data warehouse solution with robust and sophisticated report-writing capabilities.

47.     Fiserv included this data warehouse solution (called "iVue") and data analytics solution (called Business Analytics) along with the necessary Oracle hardware appliances (to allow GSB to use iVue in-house) in the Master Agreement.

48.     In July of 2022, seven months after the Master Agreement was executed, Fiserv informed GSB that it could not yet provide iVue in-house.

7

49.     Later, Fiserv admitted to GSB that it could not provide iVue in any capacity prior to the conversion go-live.

50.     Without iVue, Fiserv cannot provide GSB with the report-writing solution it requires to run its operations, which was a requirement in the RFP and Master Agreement.

51.     Fiserv also committed in the Master Agreement to recreate GSB's custom reports to meet GSB operational needs.  These reports impact relatively all of GSB's business functions.

52.     Fiserv hired a third party, Prometheus, to write GSB's 800 custom reports that GSB uses in its regular operations. Demonstrating DNA's lack of a report-writing solution without iVue, Prometheus has completed less than 8% of GSB's queries to develop custom reports after eight months' effort.

53.     As a result of these material breaches and fraudulent statements, GSB was forced to terminate the Master Agreement for cause on April 24, 2024.

54.     Termination of the Master Agreement damaged GSB, its customers, and stakeholders.  Termination was required, however, to (1) stop the apparently never-ending conversion process and resulting time and resource drain on GSB and (2) eliminate the ever-increasing risk that GSB's entire banking operations would be converted to a DNA core processing system that would cause major integrity, regulatory and/or availability issues.

55.     GSB cannot shoulder the operational burdens and risks of using its current core processing provider on a month-to-month basis while it waits for Fiserv to complete the DNA conversion.

56.     GSB's damages from Fiserv's material breaches of the Master Agreement exceed $12 million.

57.     GSB also is entitled to an award of reasonable costs and expenses, including attorneys' fees, pursuant to Section 12(i) of the Master Agreement.

58.     Fiserv contends that GSB owes an early termination fee for terminating the Master Agreement for its convenience.

59.     No termination fee is required because Fiserv has materially breached the Master Agreement.

60.     Fiserv has used the threat of an overly aggressive and windfall-producing penalty, disguised as an early termination fee, to dissuade GSB from terminating the Master Agreement – thus allowing Fiserv to continue to avoid performing its contractual duties and obligations without any consequences.

61.     Fiserv's interpretation of the termination fee would require GSB to pay it approximately $45 million dollars, which is $17 million dollars more than GSB would have been required to pay if Fiserv had fully performed over the life of the Master Agreement.

62.     Fiserv has committed to the American Bankers Association's Principles for Strong Bank-Core Provider Relationships.  One of these principles is that a bank has "[t]he right to exit a contract without penalty if the core provider is unable to deliver the contracted solution(s)."

63.     GSB seeks a declaratory judgment that Fiserv is not entitled to any termination fee, and such fee in any event is an unenforceable penalty.

## II.     Parties

64.     Plaintiff Great Southern Bank is a Missouri-chartered financial institution with its principal place of business in Springfield, Missouri.

65.     Defendant Fiserv Solutions, LLC is a Wisconsin limited liability corporation with its principal place of business in Brookfield, Wisconsin.

66. Upon information and belief, Fiserv Solutions, LLC's sole member is Fiserv, Inc. Fiserv, Inc. is a Wisconsin corporation, and maintains a principal place of business in Wisconsin.

## III. Jurisdiction and Venue

67. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

68. GSB is a citizen of Missouri. Fiserv is a citizen of Wisconsin. Therefore, complete diversity of citizenship exists.

69. The amount in controversy exceeds $75,000.00. GSB seeks contractual damages in excess of $12 million.

70. Additionally, GSB seeks a declaratory judgment regarding the enforceability of an Early Termination Fee in the Master Agreement. Fiserv contends that the Early Termination Fee is approximately $45 million dollars. Accordingly, the amount in controversy exceeds $75,000.00.

71. This Court has the authority to grant declaratory relief under 28 U.S.C. § 2201.

72. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because: (1) the Master Agreement was executed and performed in Missouri; (2) the events giving rise to GSB's claims occurred in this judicial district and division; (3) Fiserv employees regularly and consistently traveled to Springfield, Missouri to provide services under the Master Agreement.

## IV. Factual Allegations

### a. Background of the Parties and core processing

73. GSB is a financial institution with $5.8 billion in total assets and 96 offices in twelve states. GSB serves nearly 131,000 households with more than 1,100 dedicated associates.

CORE/0838898.0039/188919190.1

74.    A core processing system, or "Account Processing Platform," is the software that banks use to manage their most critical processes, such as customer accounts, transactions, and risk management. It is the bank's primary financial system of record and transaction processing.

75.    A core banking system can contain any number of processes and systems. At minimum, a core banking system typically includes:

    a.    Tracking the bank's financial transactions, including deposits, withdrawals, loans, and payments;

    b.    Assisting the bank to manage relationships with customers by storing customer data, tracking interactions, and generating reports;

    c.    Assisting the bank with identifying and mitigating risks, such as fraud and credit risk;

    d.    Interfacing with third party and/or ancillary systems that provide direct customer access to their bank accounts, such as online banking;

    e.    Supporting day-to-day operations, such as processing transactions and managing accounts; and

    f.    Generating reports that help the bank track performance, meet regulatory obligations, and make business critical decisions.

76.    A core processing system is essential for providing a seamless customer experience and maintaining compliance with regulations.

77.    Fiserv is a multinational provider of payment and financial services technology. Fiserv provides payment and mobile banking systems, account processing systems, and electronic payments products and services. It also offers services including financial solutions, business solutions, card issuer processing, network services, account processing and digital banking solutions, merchant acquiring and processing and business management platforms, item processing solutions, source capture systems, card solutions, and lending and risk management solutions. Fiserv serves a wide range of markets including banks, credit unions, other financial institutions, and merchants.

11

78. Fiserv has approximately 41,000 employees worldwide, and generated $17.7 billion in revenue in 2023. Fiserv has a market cap of $86.2 billion.

79. According to Fiserv, it has approximately 10,000 financial institution clients, and it is the leading provider in mobile banking, online banking, and payment processing.

**b. GSB's RFP process**

80. In early 2020, GSB began to analyze whether it should engage a new core process provider. To assist with this process, GSB hired a consulting firm with experience in this field.

81. In June 2020, GSB issued an RFP to several of the largest core processors in the United States, including Fiserv. The RFP contained a series of questions for the core processor to answer.

82. GSB's RFP specified the following as "Chief Criteria", among others, for a new core processing system:

   a. "Modern front and back office experiences"
   b. "Comprehensive Data Warehouse with data dictionary and effective management Reporting tools"
   c. "Conversion Methodology and relevant experience"
   d. "Conversion of existing Ad-Hoc reports and queries used for critical reports and processes"
   e. "Employee training tools/programs"

83. GSB's RFP asked Fiserv to "[i]dentify the functionality included within your response to our RFP that is presently in a Beta site or under development. Please be specific."

84. Fiserv provided its "Response to Core Processing Request for Proposal" ("RFP Response") on July 9, 2020.

85. Fiserv's RFP Response stated that "[a]ll functionality referenced in this response is generally available (not beta), unless specifically noted in any given response."

12

86.     Fiserv's RFP Response also stated that it implements standard Quality Assurance processes "[t]o guaranty the highest quality of new releases…" and that they "…coordinate the testing at volunteer client beta sites."

87.     Throughout the due diligence period, Fiserv represented that iVue had a robust reporting interface that GSB would use for custom reports and regulatory reporting, and that Fisev could provide iVue in-house.

88.     Fiserv represented UX as the user interface that GSB retail associates would use for their daily work, and Fiserv's RFP Response, subsequent sales presentations, and working sessions included numerous screenshots of the modern UX it claimed it was providing to GSB.

89.     Fiserv's RFP Response stated that UX provides employees with "what they need to efficiently provide the experience customers or members expect in today's digital age", and that "DNA provides an intelligent user interface that offers a quantum leap forward in enabling ease of use and efficiency for your employees."

90.     GSB's RFP process was not limited to written RFP responses.  During the ten-month RFP and due diligence process, GSB also attended multiple sales presentations and product deep dive sessions with each vendor, including Fiserv.

91.     In these meetings and presentations, Fiserv represented that DNA UX was the user interface that GSB retail associates would use when it converted to DNA.

92.     Fiserv also demonstrated additional surround systems that would be critical to GSB's operations for payments, digital banking, and operational workflows if GSB moved their core processing platform.

**c.      GSB Signs a Letter of Engagement**

93.      GSB decided to focus on Fiserv as its potential next core processing provider.

CORE/0838898.0039/188919190.1

94. On May 3, 2021, GSB and Fiserv signed the LOE. In that letter, Fiserv committed to providing a "Delivery roadmap for an 18-month project."

95. The LOE had a one-month term that could be renewed by the parties.

96. According to Erik Ball, Fiserv's Senior Vice President, Large Financial Institution Sales Leader, the LOE allowed Fiserv to "come in and start the install pre contract…. We will flush out gaps, work on the project plan, staffing model, solution design, etc. The artifacts then become part of the contract and it provides clarity for both sides."

97. The parties identified product gaps and potential custom needs, and Fiserv spent several weeks engaging in multiple workshops with GSB staff to discuss key processes and desired outcomes and evaluate potential functionality or process gaps that might require configuration work tailored to GSB.

98. Multiple sessions and meetings with Fiserv included demonstrations about the capabilities of DNA with the UX interface.

99. A key component of GSB's compliance with the requirements of the Office of Foreign Assets Control ("OFAC") is to scan all ACH items for OFAC screening.

100. GSB's requirements for OFAC were a key point of focus, and Fiserv made numerous representations about its ability to scan all ACH items for OFAC.

101. Fiserv made numerous representations about its ability to provide iVue to GSB.

102. In June 2021, Mr. Ball told Christine Frederick of GSB that Fiserv had clients that deployed iVue in-house and stated that in-house was the only way Fiserv originally offered iVue.

103. On October 1, 2021, Fiserv provided an iVue demonstration via WebEx. Nicole Knickerbocker of Fiserv declared that GSB would use iVue as its regulatory reporting package.

14

104.    On November 2, 2021, Lisa Godin of Fiserv used a PowerPoint presentation which stated that "iVue availability to GSB if they choose to go IH – 10.2.21 Per Erik, IH iVue and Snowflake confirmed."

105.    On November 23, 2021, Mr. Ball told GSB that it takes 18 months to complete a DNA core conversion.  This time period is necessary because Fiserv's DNA software is not an off-the-shelf product – it must be configured for GSB and integrated into GSB's operations.

106.    The DNA system as represented by Fiserv met mandates issued by bank regulators for third party risk management, and as represented gave GSB the ability to maintain a high level of confidentiality, integrity and availability of GSB's data with an in-house solution.

107.    Fiserv repeatedly represented that they had completed in-house conversions successfully in the past, and Fiserv confirmed that an in-house conversion would accommodate all of the surrounding products and processes that Fiserv marketed during the RFP and LOE periods.

**d.    The Master Agreement**

108.     The Master Agreement was signed on December 28, 2021, and set forth the terms of the parties' contractual relationship.  The Deliverables and services to be provided by Fiserv were detailed in Schedules and Exhibits to the Master Agreement, along with the fees associated with the Schedule or Exhibit.

109.    GSB's ultimate decision to choose Fiserv's in-house DNA core proposal was driven by Fiserv's claims made in the due diligence process.

110.    The Conversion Services Exhibit to the Master Agreement targeted August 2023 for the DNA conversion.

111.    The Master Agreement provides both parties with a right to terminate.  Section 8(b)(i) provides:

CORE/0838898.0039/188919190.1

Either party may, upon written notice to the other, terminate any Schedule if the other party materially breaches its obligations under that Schedule or under this Agreement with respect to that Schedule and the breaching party fails to cure such material breach within 90 days following its receipt of written notice stating, with particularity and in reasonable detail, the nature of the claimed breach. Notwithstanding the foregoing, if Client terminates the Account Processing Software Schedule (DNA) pursuant to this paragraph, then such party may also terminate all other Schedules and Exhibits to this Agreement.

112.    Section 8(d) of the Master Agreement provides in part:

<u>Early Termination</u>. If this Agreement or any Schedule terminates early for any reason other than Client's termination pursuant to Section 8(b)(i) above for Fiserv's uncured material breach of its obligations under this Agreement or Client otherwise reduces (other than as a result of account attrition or volume fluctuation in the ordinary course of business) or as a result of a termination under Section 5(b) above, then Client shall provide at least 180 days' advance written notice to Fiserv and Client shall pay a termination fee based on the remaining unused term of the Services and Products included in the monthly fees in the Fee Exhibit or any Schedule.

**e.      Fiserv Materially Breached the Master Agreement By Failing to Timely Complete the DNA Conversion.**

**i.      Fiserv failed to meet the August 2023 Go-Live Deadline**

113.    After the Master Agreement was signed, Fiserv spent several weeks engaging in multiple workshops with GSB in Springfield, Missouri to prepare a detailed conversion plan.

114.    Fiserv and GSB created an Executive Steering Committee.  The Steering Committee included executive and leaders representing the various business units and products involved in the overall solution.

115.    The Steering Committee was empowered to make decisions regarding program scope, budget and schedules, and to resolve escalated issues and risks.  The Steering Committee generally met on a monthly basis.

116.    In an "Executive" kick-off meeting on March 30, 2022, Fiserv confirmed that the DNA conversion would go-live on August 14, 2023.  This was consistent with the Conversion Services Exhibit to the Master Agreement, which targeted August 2023 for the DNA conversion.

CORE/0838898.0039/188919190.1

117.    This go-live date was a material term of the Master Agreement, as the conversion had to be completed in time to provide adequate notice to GSB's customers and before the expiration of GSB's contract with its current core processing provider.

118.    The go-live date was a material term of the Master Agreement because of the monthly costs incurred by GSB during the conversion, and the risk of burnout and conversion fatigue imposed on GSB associates.

119.    At the March 2022 "Executive" kick-off meeting, Fiserv scheduled data cuts for October 29, 2022, January 20, 2023, and April 10, 2023.

120.    A data cut entails GSB providing Fiserv with a "data slice" of GSB's core data which Fiserv then "maps" or converts into a DNA database. That database is then provided back to GSB where it is imported into the in-house DNA solution and a series of processes begin. These processes include balancing, data validation, and functional testing.

121.    Fiserv also scheduled "Mocks" for May 15, 2023, and June 26, 2023.  A Mock is a live conversion "dress rehearsal" executing the steps, actions, and procedures required to transition GSB from the current process servicer to Fiserv.  Each Mock is intended to serve as a full test of "go-live" weekend and is executed as if it were the live event.

122.    GSB hired Catalyst Consulting Group ("Catalyst") in April 2022 to assist GSB with the Fiserv conversion by providing subject matter expertise, consulting, and Program Management / Project Management services.

123.    Fiserv and GSB agreed to create and categorize open issues by taking them to project meetings and, if necessary, by submitting them to Fiserv's Client 360 portal, Fiserv's case system of record.  Items submitted to Client 360 would be investigated and corrected by Fiserv.

CORE/0838898.0039/188919190.1

124.    Fiserv consistently failed to address quality and delivery concerns in a timely manner throughout the project, as demonstrated by case records in Client 360 and various project issue tracking logs.

125.    For example, as of March 11, 2024, over 400 cases had been awaiting resolution in Client 360.  Of those cases, 204 had been open for over 120 days.

126.    Fiserv's average resolution time for open cases as of March 11, 2024 was over 145 days.

127.    In the summer of 2022, GSB inquired on progress around the iVue reporting and data warehouse solution.

128.    In August of 2022, Fiserv indicated that they would not work on iVue with OpenData that would allow for an in-house implementation.  Instead, Fiserv intended to focus on iVue with Snowflake.  Snowflake is the database used by the data analytics program iVue.

129.    In the fall of 2022, GSB inquired about the ability to scan all ACH items for OFAC, and this topic was added to the weekly engagement dashboard as a key Risk.

130.    Fiserv indicated that the OFAC functionality was in process, and committed to providing an option by October 2022.

131.    The first Data Cut occurred on October 31, 2022.  Fiserv admits that it had issues with the data mapping in the first Data Cut.

132.    In a November 17, 2022 Steering Committee meeting, David McIninch, Fiserv's Senior Vice President of Next Generation Solutions, admitted that Fiserv was "very disappointed that we stubbed our toe" with the first Data Cut.

CORE/0838898.0039/188919190.1

133.     GSB expressed concerns that Fiserv oversold its systems' functionalities, that there were mapping issues, and that several key project personnel at Fiserv had turned over, resulting in inadequate staffing of the conversion project.

134.     GSB declared that Fiserv's employee turnover cannot be a GSB conversion obstacle.

135.     In November 2022, Fiserv and GSB created a Missing Baseline Functionality List because several issues that required escalation to the Engagement Deployment Office were not being resolved.  This list was shared with each party's Executive teams.

136.     The parties jointly agreed that if Fiserv's product or solution lacked baseline functionality necessary in a modern banking core to meet operational or regulatory requirements, then Fiserv would modify the product or solution at issue to resolve the missing functionality.

137.     Eight months after the kick-off meeting, the parties had a long discussion about UX and its unavailability during the December 1, 2022 Steering Committee meeting.  Fiserv encouraged GSB to use DNA Standard, the prior, outdated user interface.

138.     GSB reminded Fiserv that it contracted for UX, not DNA Standard.  GSB also informed Fiserv that it was impracticable for its retail associates to switch back-and-forth between UX and DNA Standard during normal operations.

139.     In the December 15, 2022 Steering Committee meeting, GSB raised concerns with the progress of the DNA conversion due to Missing Baseline Functionalities and slow resolution of issues.

140.     Mr. Bisignano admitted that "GSB needs to understand how they will be able to get their job done in a more advanced way.  We want it to be better on Day 1.  GSB signed up for better operations and that's what they should get.  The job is to make everyone understand exactly

what they're getting and what is going to change in the job flow that will improve processes. Fiserv hasn't achieved this yet."

141.    In response to GSB's concerns about UX, Mr. Bisignano admitted that Fiserv "said it would be fully functional." Mr. Bisignano asked his team "What changed?" In response, Fiserv did not address the root cause, but committed to working "to shorten the timeframe for fully functioning UX as much as possible."

142.    In December 2022, GSB and Fiserv created a Step Backwards List. The parties agreed that Fiserv's products and solutions should enhance GSB's operations, and if Fiserv's product or solution was inferior to GSB's prior operations, then Fiserv would modify its product or solution to address any inferiority.

143.    Mr. Bisignano committed to correct all items on the Missing Baseline Functionality list and the Step Backwards list. Mr. Bisignano said that he did not want any GSB employee to feel like they had taken a step back in any way as a result of the conversion to Fiserv's DNA core system.

144.    The second Data Cut occurred on January 23, 2023.

145.    During the February 10, 2023 Steering Committee Meeting, Fiserv acknowledged that the second Data Cut still left significant mapping gaps before the third Data Cut.

146.    Fiserv stated that addressing the Missing Baseline Functionality was its highest priority. Fiserv committed to having all Step Backwards items with an identified resolution by mid-March 2023.

147.    During the February 10, 2023 Steering Committee Meeting, Mohit Gupta, Fiserv's Engagement Director-Enterprise Delivery Organizations, admitted Fiserv was "nervous" about its ability to go-live in August 2023.

CORE/0838898.0039/188919190.1

148.    In the February 23, 2023 Steering Committee Meeting, GSB and Fiserv had a long conversation about the Missing Baseline Functionality and a lack of progress toward resolutions.

149.    Malcom Grice, Fiserv's Senior Vice President, Banking Head of Implementation, acknowledged that "the progress is less than what we wanted."

150.    GSB again raised concerns about the lack of report writing functionality and the lack of readiness with iVue.

151.    Fiserv agreed to make a decision on whether the August 2023 go-live date was feasible by March 22, 2023.

152.    To address concerns with the lack of retail functionality in the UX system, four associates from Fiserv came to GSB and observed a retail banking center's daily operations on-site on March 8, 2023.

153.    Fiserv subsequently presented high-level functionality that could be performed in UX to GSB retail management.  GSB identified several functions that were missing from the presentation and shared those with Fiserv.

154.    GSB provided a list of those functions to Fiserv in follow-up, but Fiserv did not respond to several of the open items or provide solutions and best practice recommendations for the missing items.

155.    In a March 2, 2023 joint GSB and Fiserv Executive Touchpoint Meeting, Todd Horvath, Fiserv's Co-Head of Banking, acknowledged that Snowflake not working with iVue in-house was "missed in discussions" during the sales process.

156.    Mr. Horvath admitted that Fiserv could not deliver a version of iVue that would use GSB's in-house DNA data and that Fiserv was focusing on a solution with a cloud-hosted Snowflake.

21

157. In the March 9, 2023 Steering Committee Meeting, Mr. Grice from Fiserv admitted that Fiserv needed more time for the DNA conversion and that they were not confident Fiserv could meet the August 2023 go-live deadline.

158. Mr. Grice stated that Fiserv needed to review what their teams were doing on a day-to-day basis and insert additional expertise into Fiserv's process.

159. In March 2023, Fiserv committed to completing the conversion by May 2024.

160. GSB conditionally accepted this extension with the understanding that Fiserv would agree to a detailed schedule of work that would be incorporated into an amendment to the Master Agreement and complete all work by December 1, 2023, to ensure adequate time for associate training, customer notification, and Mock exercises.

ii. **Fiserv refuses to amend the Master Agreement.**

161. On May 1, 2023, Eric Johnson of GSB emailed Fiserv requesting an amendment to the Master Agreement to mitigate the ongoing risk and ensure Fiserv provided adequate experienced personnel. Mr. Johnson sought to establish deadlines and deliverables with ratability and accountability as GSB moved toward a project completion date.

162. In this context, ratability and accountability simply meant that GSB wanted a plan to meet the delivery deadline of December 1, 2023, with measurable progress between May 1, 2023 and December 1, 2023. The progress was expected to be proportional to the time spent and the time remaining to complete the work.

163. In the proposed amendment, Mr. Johnson included May 27, 2024, as a new go-live date. Mr. Johnson also proposed that:

    a. All mission critical forms, letters, and reports would be completed by December 1, 2023;

b.  All "Missing Baseline Functionality" and "Tier 1"[1] items would be completed with an agreed-upon resolution by December 1, 2023;

c.  All interfaces would be completed by December 1, 2023; and

d.  The implementation of all Fiserv surrounds as well as third party applications sold to GSB would be completed by December 1, 2023

164.    Completing the aforementioned conversion work by December 1, 2023, was necessary to allow for sufficient time for procedure writing, training curriculum development, associate training, customer notification, and Mock exercises to prepare for the go live.

165.    The Steering Committee did not meet again until July 6, 2023. At that meeting, Fiserv verbally committed to an amendment to the Master Agreement.

166.    The parties agreed that additional Data Cuts were necessary because Fiserv had failed to complete the data mapping that GSB had delivered, some of which was delivered prior to the First Data Cut, and had not delivered enough functionality to meet readiness benchmarks after the third Data Cut.

167.    On a telephone call with Mr. Turner and Mr. Johnson on July 21, 2023, Mr. Bisignano said he told his employees to get the amendment done, and that GSB should be provided with all the optionality it wanted.

168.    Mr. Bisignano committed to fixing the problems or Fiserv would not have GSB as a DNA client.

169.    Mr. Bisignano also said that it was Fiserv's job to regain GSB's trust and confidence.

170.    After exchanging several drafts of an amendment to the Master Agreement, Fiserv sent its final draft amendment on July 19, 2023.  This draft did not address ratability.

---

[1] "Tier 1" was used by the parties as a reprioritization of Missing Baseline Functionality and Step Backwards items. These terms have been used interchangeably by the parties.

CORE/0838898.0039/188919190.1

171. In response GSB informed Fiserv that any amendment would need to address ratability and that GSB needed to add the option to terminate given the resources and expenses required to continue the process beyond the original go-live date.

172. Fiserv refused to engage any further in discussions about amending the Master Agreement.

### iii. GSB's Notice and Cure Letter

173. Fiserv's performance continued to deteriorate.

174. On June 5, 2023, Mr. Turner and Mr. Johnson of GSB had an in-person meeting with Mr. Ball and Chris Foskett, Fiserv's Vice Chairman, Sales and Relationship Management of Fiserv.

175. GSB expressed dismay with the lack of focus and progress since the March Steering Committee meeting, and Mr. Ball said that Fiserv had taken its foot off the gas.

176. Mr. Turner stated that the inability to go-live by August 2023 was not the fault of GSB. Mr. Ball replied that he did not know of anyone at Fiserv that would disagree with that statement.

177. At the August 3, 2023 Steering Committee meeting, two Workstreams were turned to a Fiserv-defined Red status due to missing resources.

178. Fiserv defines "Red" and "Yellow" statuses as:

> **Red:** (if any one condition is true the program health is red)
> - One or more key program deliverables are experiencing issues that will delay the agreed upon end date, jeopardizing business goals
> - One or more key program deliverables are experiencing scope or quality issues that do not meet the program's acceptable thresholds needed to achieve the agreed upon program benefits/business goals
> - Overall program business case will not be achieved due to budgetary variance or other cost factors
>
> **Yellow:** (if any one condition is true the program health is yellow)

- One or more key program deliverables are experiencing issues affecting the interim program milestone dates OR
- One or more key program deliverables are experiencing issues with scope or quality which can affect the overall program's ability to deliver the required business goals* OR
- Overall program business case is at risk of being achieved due to budgetary variances or other cost factors

179. Mr. McIninch requested that GSB stop identifying issues that would purportedly increase the scope of Fiserv's work.

180. Mr. Turner responded that GSB cannot stop identifying issues that are critical to the basic functionality of the system because such issues need to be identified and solved before GSB goes live with DNA.

181. GSB also reminded Fiserv that not all products / features / functionality had been delivered, and if those were not functioning as committed (as had been the case with multiple products throughout the implementation), GSB needed the right to notify Fiserv of those errors and issues so they could be solved prior to going live.

182. As of August 3, 2023, Fiserv's Integrated Master Schedule ("IMS") reflected that only 41% of the work had been completed, which was a mere 9% increase from the metrics five months prior. In other words, Fiserv's own metrics revealed that at the time the conversion was originally scheduled to be completed, it had only completed 41% of the work necessary to convert.

183. This percentage actually under-estimates the scope of work left to be completed as it did not include all Missing Baseline Functionality items.

184. On September 1, 2023, GSB sent Fiserv a notice and cure letter pursuant to Section 8(b)(i) of the Master Agreement.

185. Pursuant to the Master Agreement, Fiserv had ninety (90) days to cure their material breaches.

CORE/0838898.0039/188919190.1

186. As detailed in the September 1st letter, Fiserv had failed to address the 290 cases contained in the Client 360 portal –37% of which were more than 120 days old.

187. GSB identified the following material breaches in the Master Agreement:

a. Failure to meet the August 14, 2023, go-live deadline;

b. Failure to perform a Root Cause Analysis of the missed go-live production date;

c. Failure to timely perform its conversion obligations as reflected in the number of open cases in the Client 360 portal;

d. Failure to provide the iVue in-house data analytics and data warehouse platform and instead insisting that GSB must use the inadequate CRM/BI product for regulatory and other mission-critical reports despite informing GSB that CRM/BI was incapable of generating such reports;

e. Failure to provide a fully-functional DNA UX for retail associates;

f. Failure to provide a fully-functional in-house FCRM product, including the inability to complete OFAC scans of all ACH files in a timely manner;

g. Failure to provide a real-time interface between DNA and Centrix;

h. Numerous other products and solutions that exhibit missing or reduced functionality from Fiserv's sales presentations and documentations as detailed in the September 1st letter; and

i. Failure to adequately staff GSB's conversion project.

188. In Section 2 of the Conversion Services Exhibit, Fiserv promised to "provide appropriate resources to ensure a timely and quality implementation of the entire solution set as set forth in the Fee Exhibit." GSB's September 1st letter detailed how Fiserv materially breached the Master Agreement by consistently failing to provide appropriate staff:

- **Workstream Projects**: As of mid-August 2023, there were nine Workstream Projects in Fiserv-defined Red or Yellow status. Fiserv itself admitted that at least four were directly caused by its lack of staff.

- **DNA Conversion**: The Program Manager took leave on June 1, 2023. Fiserv initially did not replace the Program Manager, but instead stated that the current Project Manager would serve as both the Project Manager and the Program Manager. This is a direct violation of the Master Agreement. The weekly Program Manager meetings were cancelled between July 5, 2023, and August 30, 2023. Additionally, the DNA Operations Consultant meetings

were cancelled and then changed from weekly to bi-weekly because of Fiserv's inability to staff such meetings. It was not until November 8, 2023 that Fiserv announced it was filling the DNA Program Manager role with a person that Fiserv admitted "has no DNA experience".

- **Digital Document Advantage (DDA) Schedule**: This project kicked off in April of 2023, but an implementation resource was not assigned until September 2023. As a result, no development or configuration tasks occurred. The DDA project went more than 135 days without an implementation resource or notable progress from Fiserv.

- **Nautilus Schedule**: The Fiserv Project Manager told GSB and Fiserv employees that he would recuse himself from the project if Fiserv continued to understaff it.

- **CRM and Business Intelligence (CRM/BI) Schedule**: This Schedule was without a Project Manager from March 2023 until August 2023. As a result, at least five scheduled sessions were cancelled.

- **DNA Technical Workstream**: Four different DNA Field Technicians have left the conversion project, forcing GSB to wait several weeks for the identified replacement to complete work for another Fiserv client.

- **Loan Group Support**: Fiserv has failed to appropriately staff the Lending workstream creating inefficiencies and setbacks throughout the conversion process. The Lending team has had three different loan consultants assigned to the team and two different data mapping analysts, with limited visibility into the transfer of knowledge or consistency. Fiserv acknowledged this lack of resources in December 2022, committing to add more resources to the Lending workstream; however, both the original loan consultant and the subsequent loan consultant have exited Fiserv and/or this project, causing confusion and inefficiency. For example, during Data Cut 4, Fiserv's newly-assigned loan consultant recommended actions that directly contradicted guidance from the previous loan consultant.

- **Meeting Attendance**: Fiserv employees have been absent or unprepared for important meetings. For example, a Testing Workstream meeting occurred on May 23, 2023. GSB had 49 attendees - Fiserv had six. Fiserv was unable to contribute to the meeting due to the absent subject matter experts.

189.    Fiserv resources assigned to the GSB project lacked stability, and this clearly contributed to conversion dates not being met. This can be contrasted with the stability of GSB's team. For example:

a.    Fiserv's "Customer Relationship Manager" position has been vacant for seven months (and is still vacant).

b.    At least 35 Fiserv employees who worked in critical roles specific to the GSB conversion are no longer at Fiserv.

27

c. The Fiserv "Executive Sponsor" role has turned over three times. This is the highest Fiserv governance role in the conversion and enables senior executive-level relationships to increase mutual commitment and success with the partnership.

d. Nayan Patel, a Fiserv Senior Vice President who was a critical leader on the GSB conversion project, left Fiserv in March 2024.

### iv. Fiserv's failure to cure

190. Pursuant to Section 8(b)(i) of the Master Agreement, Fiserv was afforded 90 days to cure the material breaches identified by GSB in its September 1, 2023, notice and cure letter.

191. In a written response dated September 8, 2023, Fiserv did not dispute their nonperformance under the Master Agreement. Instead, Fiserv attempted to portray GSB's written notice of Fiserv's nonperformance as "pretextual" and accused GSB of threatening to cease performing under the Master Agreement.

192. This contention was baseless, as GSB had paid Fiserv millions of dollars in fees, devoted thousands of hours of associate time toward this conversion, and spent millions of its own dollars on extensions, consulting fees, and other out-of-pocket costs related to this conversion.

193. GSB had never expressed a desire to terminate the Master Agreement if there was a path to a successful conversion with an acceptable amount of risk that would meet GSB's regulatory obligations.

194. In the September 8th letter, Fiserv took the position that "Fiserv's obligation under the Master Agreement [] is to deliver a successful conversion by May 2024."

195. The fourth Data Cut occurred on August 14, 2023, and it was discussed at the September 19, 2023 Steering Committee meeting. Data Cut 4 was not considered a success as multiple issues were encountered.

196. In addition, data mappings that had been correct in previous Data Cuts were found to be incorrect in this Data Cut.

28

197. Fiserv's "Readiness Assessment" exercise for Data Cut 4 showed thirty-three percent of the assessment in Red and an additional fifty-five percent in Yellow.

198. Fiserv had little to no success in curing any of its material breaches identified in GSB's September 1st letter.

199. Fiserv refused to provide a root-cause analysis required under Section 15 of the Conversion Services Exhibit to the Master Agreement, and has failed to take any preventative measures to prevent similar failures from occurring.

200. In the November 2, 2023 Steering Committee meeting, the overall engagement was turned to Red status, including DNA and a host of surrounding products.

201. Mr. Patel acknowledged that there were 39 newly identified issues for UX that Fiserv was reviewing, and stated that fixes would be available by February 29, 2024 – days after the first Mock scheduled for February 26, 2024. Fiserv acknowledged that it could not provide these fixes before February 29th.

202. Mr. Patel pledged that half of the Missing Baseline items would be delivered by December 1, 2023. Mr. Patel acknowledged the risks of installing code at this point in the conversion timeframe.

203. In response to GSB's statement that UX was unworkable and broken, Mr. Patel admitted that Fiserv may not have given UX its due attention.

204. Fiserv failed to deliver even 20 percent of the Missing Baseline items by December 1, 2023.

205. Three months after the September 1st notice and cure letter, as of December 5, 2023, Fiserv's IMS reflected that only 56% of all conversion activities had been completed.

CORE/0838898.0039/188919190.1

206.     As of September 1, 2023, there were 290 unresolved cases in the Client 360 portal. More than three months later, as of December 5, 2023, there were 435 unresolved items in Client 360, 136 of which are older than 120 days.

207.     As of September 1, 2023, there were 9 workstreams in Fiserv-defined Red or Yellow status.  More than three months later, as of December 5, 2023, there were 14 workstreams listed as Red or Yellow status.  As of March 25, 2024, there were 15 workstreams in Red.

208.     The fifth and final Data Cut took place on December 4, 2023.  The results were no better than Data Cut 4.

209.     Fiserv stated that the balancing process for a final Data Cut should be able to be completed in the first two hours and that the data validation process should be able to be completed in an additional six hours.

210.     In Data Cut 5, due to mapping and other data issues, the balancing process took seven hours rather than the intended two hours, and the data validation process took approximately 24 hours rather than the intended six hours.

211.     Fiserv's failure to meet these benchmarks for a successful final Data Cut prior to the first Mock likely necessitated another Data Cut.

212.     Additionally, some data mappings that had been correct in Data Cut 4 were no longer correct in Data Cut 5, which was the final Data Cut prior to Mock 1.

213.     Thus, Data Cut 5 was a step backwards in general, and illustrated that Fiserv had unintentionally broken part of the prior completed data mapping.

214.     In the December 7, 2023 Steering Committee meeting, Mr. Patel admitted that Fiserv had let UX issues slip.

CORE/0838898.0039/188919190.1

215. This has been a pattern throughout the project where Fiserv's employees have admitted to GSB that the UX team at Fiserv was "still building out [the] internal environment" and "Fiserv individuals that are associated with their projects are not familiar with UX."

216. When GSB requested training materials to prepare, Fiserv admitted that it did not have a training program or training material developed for the current version of UX that GSB was running, nor did they have a training environment built.

217. On December 5 and 6, 2023, Fiserv scheduled a UX teller training session for several GSB associates.

218. During the training session on the Fiserv UX environment, the instructor and trainees ran into several errors. GSB users received many of the same errors during testing in the GSB environment.

219. The instructor was very frustrated and apologetic about the repeated errors. To continue with the training, the instructor suggested that the trainees just watch to help avoid errors.

220. Because the training was intended to be hands-on for GSB, the suggestion to only observe the functions coupled with the continued system errors made the training ineffective.

221. On January 5, 2024, after Data Cut 5, Lori Tremonti, Fiserv's Vice President for Implementations and Professional Services, indicated that Fiserv's own post-Data Cut "Readiness Assessment" exercise was not worth performing as it was an ineffective tool because of the condition of the Data Cut data mapping and the Fiserv solutions current state. According to Fiserv, this exercise provides "an overall assessment of readiness for mock and go-live events."

222. Additionally, Fiserv had not addressed the gaps in report-writing.

CORE/0838898.0039/188919190.1

223.     Mr. Patel admitted that Fiserv was not where they wanted to be, and report writing was not ready for the first Mock.  Without iVue, the DNA conversion provides GSB with no report-writing capabilities for regulatory and mission-critical reports.

224.     Fiserv had also not completed the series of custom reports specified in the Master Agreement.

225.     GSB consented to Fiserv's request to hire Prometheus to write reports in CRM/BI that GSB currently uses in its daily operations.  GSB provided Fiserv with the approximately 1,000 reports it uses in its daily operations.  Based on efforts by Fiserv, GSB and Prometheus to identify existing standard DNA and duplicate reports, approximately 800 reports were identified to be written by Prometheus.

226.     Since the kick off with Prometheus on July 7, 2023, Prometheus has received approval on the data sets for 63 reports, which is only 8% of the total commitment; however, no reports have been completed or delivered as of the date of this lawsuit.

> **v.     Fiserv concedes that it is unable to go-live in May 2024.**

227.     Prior to every Steering Committee meeting, Fiserv prepares an Executive Update PowerPoint.  Historically, this PowerPoint is finalized with GSB's input.

228.     In the Executive Update PowerPoint for the January 11, 2024, Steering Committee meeting, Fiserv admitted:

- "The overall engagement has continued to be red due to key delivery items being addressed.  These include ongoing **DNA/tMagic** product development and UX development items and errors, **Training** due to unavailability of required solutions and not enough time for Bank to train their users prior to Mock 1, end-to-end test of the integrated **PEP-FCRM** solution, **CheckFree** requirement for MMA accounts, **CRM/BI** delivery alignment, **Custom Solutions** delivery and alignment on delivered items and **Print Ready** delay in notices requirements."

- "FCRM – 64% of testing has been completed but major issues require resolution before additional testing can occur."

CORE/0838898.0039/188919190.1

- "DNA Data Cut 5 testing is 32% complete with a 12.7% failure rate of test cases. Fiserv has indicated that the Readiness Assessment that should occur after a Data Cut is an 'ineffective tool' with the number of surrounds and functionality that have yet to be implemented."

- "DNA and UX 2024.1 contains UX enhancements and will be installed mid-March."

- "Fiserv is proposing an additional solution via a Third Party that could solve multiple problems that we are having with the CRM/BI path. This solution should fill some of the gaps that we are experiencing in the Data Warehouse space as well as the ability to supply Reporting, Workflows, BI as well as Executive Reporting but not provide the full functionality to completely replace CRM/BI."

- "CheckFree does not allow 'pay from' account to be a savings account in current Product design; the option to reclassify impacted accounts to MMA is available for Day 1, however it requires parameter changes in DNA core that introduce unacceptable risk at this point in the conversion."

229.    The PowerPoint that Fiserv authored and presented to the Steering Committee on January 11th concluded that "GSB and Fiserv believe that there currently is an unacceptable amount of risk with the existing go-live date. Fiserv is proposing options, one of which would be realigning the timeline."

230.    During the Steering Committee meeting, Mr. Turner stated "[t]here is too much risk for our May go-live date, and it makes no sense to have a Mock in February." Mr. Turner then asked the Fiserv representatives for their proposal.

231.    Mr. Patel answered, "Let's use the existing go-live date as Mock 1 and do a Labor Day go-live. In order to do that, the things we've talked about here need to be resolved rather quickly. We have to meet our dates to get our resolutions. We need to review lists and see how that alters our thoughts on going live in general. I think we can find a path forward on the reporting gap with augmentation. We have some huge items to clear up in four to six weeks and that will let us know if we feel good about these dates. We will need to confirm the timing with our resources as well and share that information with [GSB]."

CORE/0838898.0039/188919190.1

232. To be clear, Mr. Patel indicated that Fiserv has "some huge items to clear up in the next four to six weeks" to determine whether Fiserv could complete a Mock 1 in May 2024 and the conversion in September 2024.

233. Likewise, Mr. Gupta stated that he needed to "get more clarity on if we can even do go-live on Labor Day."

234. At the January 11th Steering Committee meeting, Mr. Turner stated that in order to consider Fiserv's request to move the go-live date, GSB would need: (1) a detailed plan as to how Fiserv would be ready for the go-live date; (2) a root cause analysis; and (3) a list of what Fiserv can and cannot deliver with regard to outstanding cases.

235. Fiserv's President of Core Processing Dudley White committed to getting those items to GSB within two weeks.

236. On January 24, 2024, Mr. Patel provided GSB with a list of 97 items that Fiserv could not deliver regardless of the date of the conversion.

237. On January 26, 2024, Mr. White provided a "project plan," but it failed to provide any details as to how Fiserv would be ready for a September 2024 go-live date.

238. Mr. White failed to provide a root cause analysis, and a root cause analysis has not been provided from anyone at Fiserv.

239. Mr. White failed to provide GSB with a list of the cases that Fiserv could resolve, and indicated that more items were likely to be added to the list of 97 items that Fiserv could not deliver.

240. Despite Mr. Patel's warning that Fiserv had "some huge items to clear up in the next four to six weeks" before it could determine whether Fiserv could complete a Mock 1 in May 2024

CORE/0838898.0039/188919190.1

and the conversion in September 2024, Fiserv has not made any material progress on its conversion efforts.

241.    GSB's consultant Catalyst performed an assessment of the project in February 2024 and informed GSB that there was no possible way to conduct a Mock conversion on March 11th or to go-live on May 27, 2024.

242.    As of March 1, 2024, the DNA conversion project is 26 months post execution of the Master Agreement, and 34 months post execution of the LOE.  Yet there is no evidence that Fiserv can complete the DNA conversion as there are 15 workstreams in Red status.

### vi.    Without a root-cause analysis and without a detailed project plan, Fiserv claimed that it could achieve a May 2024 go-live date.

243.    After admitting on January 11, 2024, that it was not ready to go-live by May 2024, Fiserv abruptly declared on January 26, 2024, that it was in position to go-live by May 2024.

244.    After being repeatedly pressed by GSB on why Fiserv now believed it could complete the conversion by May 2024, Fiserv claimed that it was reducing the scope of products, services, and modifications it would provide to GSB.

245.    Fiserv's claim that it could go-live in May 2024 was unsupportable.  Putting aside the parties' disagreement as to the scope of products, services, and modifications under the Master Agreement, Fiserv could not go-live in May 2024.

246.    Fiserv has consistently recommended that two associates per each GSB banking location be fully trained and participate in Mock 1 – a total of 180 associates.

247.    Had Fiserv provided an operational DNA with a functional UX, GSB would need, at minimum, ten weeks to document all relevant processes, draft training manuals for its associates and then train them on UX before Mock 1 (a timeframe that Fiserv has indicated is reasonable).

CORE/0838898.0039/188919190.1

248.     All associates would need to be fully trained to participate in Mock 2. GSB would need another six weeks to train the remainder of its associates for Mock 2.

249.     Such training is absolutely critical, as any core processing system that GSB's retail associates cannot use is worthless and would create undue consumer and regulatory risk.

250.     As a result, to provide adequate time for drafting training manuals and procedures, completing a round of training for Mock 1, and completing another round of training for Mock 2 before a May 27, 2024 go-live date, Fiserv would have needed to provide a fully functional DNA system by December 25, 2023.

251.     Fiserv did not provide a fully functional DNA system by December 25, 2023.  To the contrary, Fiserv has failed to provide a fully functional DNA system as of the date of this lawsuit.

252.     Nevertheless, Fiserv proposed that Mock 1 occur on March 11th in an effort to go-live on May 27, 2024.  There was no possible way that a successful Mock 1 could occur on March 11th due to the missing critical functionality and surrounding solutions that would be necessary for a successful Mock.

253.     Fiserv "tentatively" intended to provide a more comprehensive UX release in mid-March 2024 that would resolve some of what Fiserv called the UX "show stopper" issues.

254.     Even if that release was effective, these issues would not have been resolved until after the proposed March 11th Mock.

255.     The Master Agreement states that a Mock "is intended to serve as a full test of 'go-live' weekend and will be executed as if it were the live event".

256.     Thus, a fully-functional UX is critical to the success of Mock 1; there is no point in conducting a Mock without a fully-functional UX.

CORE/0838898.0039/188919190.1

257.	Conducting an effective Mock on March 11th was impossible.

258.	Performing two Mocks is a contractual requirement in the Master Agreement. Not performing two effective Mocks before conversion would result in an unacceptable amount of risk, and would leave GSB with inadequate time to ensure that critical business functions will operate as needed by the go-live date.

259.	Fiserv's nonperformance was not limited to UX. As of February 9, 2024, the following fifteen Workstreams were in Red in Fiserv's IMS: (1) Governance; (2) DNA; (3) Training; (4) tMagic; (5) CRM/BI; (6) Custom Solutions; (7) FCRM; (8) CheckFree SBBP; (9) PEP+; (10) TCM; (11) Print Ready; (12) Nautilus; (13) Architect; (14) CheckFree NEXT; and (15) Commercial Center.

260.	Despite conducting five Data Cuts, Mrs. Tremonti of Fiserv declared that a post-Data Cut "Readiness Assessment" exercise was not worth performing as it was an ineffective tool because of the condition of the Data Cut data mapping and the number of surrounds and functionality that had yet to be implemented.

261.	On February 21, 2024, Mr. Johnson asked Fiserv in an email for references from any Fiserv client that had entered into their first Mock with 15 workstreams in Red and an unusable Retail system.

262.	Fiserv did not respond to Mr. Johnson's question.

263.	Fiserv also attempted to shift the blame for its continued nonperformance to GSB, even though Fiserv representatives had never previously indicated that GSB was the cause of any delays to the DNA conversion.

CORE/0838898.0039/188919190.1

264. After admitting it could not go-live in May 2024, Fiserv claimed that it was unable to timely finish the DNA conversion because GSB was requesting "modifications" that exceeded the scope of the Master Agreement.

265. In reality, most of these "modifications" were either contractual obligations or fixes of missing baseline functionalities. Fiserv's excuse was raised for the first time in January 2024.

266. The Master Agreement allows GSB to expand the scope of work under the Master Agreement by requesting additional items.

267. Should Fiserv deem a GSB request to be outside the scope of the Master Agreement, Fiserv would prepare a Statement of Work that details the additional work requested, the time to complete the additional work, and the cost of the additional work.

268. Fiserv issued several such Statements of Work throughout the lifespan of the DNA conversion project, but in each case Fiserv indicated the additional work would not impact the conversion timeline.

### vii. The Parties Are Unable to Reach a Resolution

269. Under Section 9 of the Master Agreement, the parties are required to work in good faith to resolve any disputes and claims under the Master Agreement before initiating legal action.

270. On March 1, 2024, representatives of GSB met with representatives of Fiserv in Kansas City, Missouri pursuant to Section 9 of the Master Agreement to discuss in good faith the possibility of resolving the parties' differences under the Master Agreement.

271. The March 1, 2024, meeting did not result in a resolution.

272. An additional teleconference on March 22, 2024, failed to result in a resolution.

### f. Fiserv Materially Breached the Account Processing Software (DNA) Schedule by failing to provide a fully functional DNA UX and tMagic

CORE/0838898.0039/188919190.1

273. GSB retail associates process approximately 200,000 or more transactions per month. Given the materiality of the user interface to GSB's retail operations, GSB specifically contracted for an operational and generally available UX system in the Master Agreement.

274. Fiserv intentionally failed to inform GSB that the only fully operational user interface was DNA Standard.

275. Throughout the due diligence process, Fiserv repeatedly misrepresented that Fiserv's retail user experience (UX) was both very modern and intelligently designed, which would enhance our user experience and increase efficiency.

276. Fiserv repeatedly portrayed UX as the user interface for retail employees and that all banks' retail operations would be conducted with UX.

277. Despite Fiserv's claims to the contrary, Fiserv did not have a fully functional and operational version of UX for use by GSB's retail associates when it provided its RFP Response to GSB.

278. At no point in time prior to the signing of the Master Agreement did Fiserv inform GSB that the UX features shown in the sales presentations were still under development, and that other financial institutions with DNA were using DNA Standard, an outdated, prior generation user interface for processing retail transactions.

279. DNA Standard is a materially inferior user interface when compared to GSB's user interface with its current core processing system.

280. Between July and September 2021, Fiserv's Jason Woods misrepresented, via demonstrations, the availability of UX features by presenting them to GSB as already functioning. Among those features that Mr. Woods misrepresented were UX and tMagic integration,

CORE/0838898.0039/188919190.1

transaction processing that is still not available, and the availability of integrated sales functionality.

281.    It was not until May 2022, nearly five months after the Master Agreement was signed, that Fiserv informed GSB that UX was incapable of performing all retail transactions.

282.    Fiserv later informed GSB that some of the UX features demonstrated to GSB were not slated to be complete until 2024.

283.    For example, Fiserv attempted a UX training sessions on December 5, 2023, and December 6, 2023. This training failed as the Fiserv trainer admitted there "…are bugs and defects that are being worked out as we speak."

284.    GSB also contracted for tMagic, which allows GSB associates to scan items directly into the DNA system. GSB has used "teller capture" of scanned items for many years, and is the reason it contracted for tMagic.

285.    tMagic is unusable with UX. Too frequently, attempts to scan items result in repeated scanner jams due to software errors and often requires restarting the entire UX system.

286.    Additionally, scanned items are dropped from the transaction with no warning, causing deposits to process incorrectly.

287.    UX and tMagic also will combine the check and account number together, resulting in inaccurate check information for scanned items.

288.    Upon information and belief, and contrary to Fiserv's representation that its products were generally available to its clients, GSB has been informed by peers that no other financial institutions use UX and tMagic together because they are not compatible.

289.    Fiserv claims that there are three financial institutions that use UX and tMagic together.

CORE/0838898.0039/188919190.1

290. On February 8, 2024, GSB had seven associates attempt 179 transactions on UX over a three-hour time period. 53 transactions caused errors, the scanners jammed 27 times due to software errors, and the UX system had to be completely rebooted 13 times. This is a 30% error rate.

291. For perspective, GSB used core provider Jack Henry & Associates' user interface for approximately 2.4 million transactions in 2023, and Jack Henry's user interface had a total of 15 reportable errors. This is a 0.00063% error rate.

292. UX currently has extremely limited capability for retail transactions, and even then, the limited capability is unacceptable and unstable.

293. UX in its current form is unusable.

294. Upon information and belief, Fiserv had not converted a single financial institution fully into UX as of December 31, 2023.

295. GSB would not have selected Fiserv as its next core processing provider if it had known that no other financial institution was using UX at the time of GSB's RFP.

296. GSB would not have selected Fiserv as its next core processing provider if it had known that its retail associates could not use UX as represented by Fiserv.

297. Fiserv's failure to provide UX and tMagic is a material breach of the Account Processing Software (DNA) Schedule. Without a functional UX with tMagic, the DNA core processing system is unusable for retail operations.

298. This alone justifies GSB's termination of the Account Processing Software (DNA) Schedule and the Master Agreement for cause.

**g.  Fiserv materially breached the iVue Software Schedule and the Account Processing Software (DNA) Schedule.**

CORE/0838898.0039/188919190.1

299. GSB contracted for Fiserv's iVue system to serve as an in-house data analytics, data warehouse platform, and report writer for the DNA processing system. The ability to run reports is critical to both GSB's daily operations and its relationship with its regulators.

300. Fiserv committed to GSB in the Master Agreement to make iVue available for an in-house implementation by leveraging either OpenData or Snowflake.

301. After signing the Master Agreement, Fiserv informed GSB that it did not intend to make iVue available with OpenData as promised, thus preventing GSB from using iVue as a solution utilizing GSB's DNA data in-house.

302. Fiserv subsequently indicated that GSB would have to wait on the Snowflake version of iVue until the summer of 2024.

303. The Snowflake version of iVue would require GSB to transfer customer data to a cloud environment from DNA and other data repositories, creating additional security and regulatory risks.

304. Fiserv later requested that iVue be completely removed from the scope of the Master Agreement because it could not provide iVue in any format.

305. GSB did not agree to the removal of this critical product.

306. Because Fiserv could not provide a functional iVue system, Fiserv instructed Great Southern to use CRM/BI for regulatory and other mission-critical reports.

307. GSB was alarmed by this instruction, as Fiserv had previously and repeatedly told GSB that CRM/BI was not to be used for regulatory or mission critical report writing.

    a. On October 5, 2022, Fiserv instructed GSB that the CRM/BI report writer "[s]hould not be used for regulatory reporting, critical dependent processes, balancing, vendor/third party extracts, complex selection criteria, and recreating standard DNA reports."

    b. Indeed, Fiserv told GSB in a PowerPoint slide that:

42

- The CRM/BI "application should not be used to create reports that are part of a critical business process (as defined by the institution), used for regulatory reporting, balancing, recreating standard DNA reports, or to create extracts for vendors/third parties."

c. Fiserv provided several reasons why reports should not be created using CRM/BI, including:

- "The reports are not reviewed for regulatory compliance. If a regulatory report is needed, the standard DNA reports should be used as these are updated as needed by Fiserv."

- "The report may not capture all out of balance details and could have an impact on the institution. Standard DNA balancing reports should be used as these are reviewed and updated on a regular basis by Fiserv."

- "Selection criteria may be too complex for the application to process."

308. On July 12, 2023, John Collins, a DNA Program Manager for Fiserv, learned that Fiserv had recommended that GSB use CRM/BI for regulatory reports. Mr. Collins told GSB that "I'm a bit concerned that we are using CRM/BI to generate regulatory reports. We always recommend not to use CRM/BI for regulatory reports. I think this is a Tier 1 and it needs a larger discussion." Tier 1 refers to a major problem that needs to be solved immediately.

309. Indeed, Fiserv later acknowledged that CRM/BI was an inadequate report writing system, and recommended that GSB use a third party data warehouse and report-writing system owned by LodeStar.

310. GSB contracted for a sophisticated, in-house report writing system. Outsourcing its report writing to a third party – one that GSB has had no chance to perform any due diligence on – is an unacceptable risk.

311. Additionally, Fiserv was contractually obligated to create the reports that GSB uses in its daily operations.

312. GSB agreed that Fiserv could engage Prometheus to assist Fiserv with drafting these 800 reports. Between the start of its engagement on July 7, 2023, and March 15, 2024,

43

Prometheus has only completed creation of datasets needed for 63 reports, and has not successfully completed any useable reports.

313.     Neither DNA, nor any other core processing system, can be acceptable without providing bank employees a tool to write accurate reports in a timely manner.

314.     The lack of a report-writing functionality is undoubtedly an issue that regulators would focus on in their reviews. Regulatory reporting is not a wish-list custom item, it is basic functionality for any bank's core processing function.

315.     iVue was intended to provide additional services beyond reporting, including dashboards, business analytics, and the ability to integrate with third parties using multiple custom data formats.

316.     This functionality is not being delivered by Fiserv via iVue or any other Fiserv solution.   The loss of this functionality is material to numerous GSB business lines and its relationship with its regulators.

317.     GSB would not have selected Fiserv during the RFP process if it knew that iVue was unavailable.

318.     GSB would not have signed a Master Agreement with Fiserv had it known that it had no solution for critical report writing.

319.     Fiserv's inability to provide iVue is a *per se* material breach of the iVue Software Schedule.

320.     Fiserv's failure to provide iVue, which Fiserv describes as part of the DNA Software subject to the Account Processing Software (DNA) Schedule, is a material breach of the Account Processing Software (DNA) Schedule.

CORE/0838898.0039/188919190.1

**h.    Fiserv has breached the Master Agreement by failing to provide a compliant Currency Transaction Reporting system.**

321.    Fiserv has breached the Master Agreement by failing to provide a fully automated and compliant Currency Transaction Reporting ("CTR") system which does not require significant manual intervention.

322.    GSB is obligated to report all cash deposits or withdrawals aggregating to greater than $10,000 in a single banking business day to FinCEN, a division of the United States Treasury.

323.    Currently, Fiserv's system auto-populates the benefactor of a CTR reportable cash transaction with all owners of the account. Fiserv's system creates CTR reports based on its auto-population. Because the account owners may not always be the benefactors of a CTR reportable cash transaction, particularly for a cash withdrawal from a joint account or a check cashed by a non-account owner that is also drawn on GSB, the reports are generated inaccurately.

324.    There are numerous other CTR-related errors:

a. DNA does not support the identification of customers with CTR exemptions, which results in GSB associates being prompted with CTR screens for exempt customers.

b. CTR processing cannot be completed in UX due to inconsistent system prompts for Benefactor and/or Transactor information, necessitating manual intervention by front-line associates which is not ultimately retained by the system.

c. DNA does not accommodate required Monetary Instrument Log tracking for gift cards and travel card sales.

d. UX does not always prompt for CTR information on change orders.

325.    Fiserv's Currency Transaction Reporting system is unusable as it does not allow GSB to satisfy its regulatory reporting obligations.

45

i.  **Fiserv has materially breached the Master Agreement and associated Schedules.**

326.  Fiserv's January 24, 2024 declaration that it would not deliver a list of 97 items is a material breach of Master Agreement and more specifically the Account Processing (DNA) Software Schedule.

327.  As of the date of the filing of this lawsuit, there are over 400 open cases in Client 360.

328.  Fiserv declared that it would not provide GSB with real-time Positive Pay Interface with Centrix.  This is a direction violation of the DNA Software that is subject to the Account Processing Software (DNA) Schedule.

329.  In August 2023, Fiserv admitted that it is unable to provide a real-time interface between DNA and Centrix and will only provide a batch interface, which is in material breach of the Master Agreement and Section 13 of the Conversion Services Exhibit.

330.  The inability of Fiserv (and Prometheus) to deliver the 800 reports that GSB uses in its regular operations is a material breach of the Conversion Services Exhibit to the Master Agreement.

331.  GSB paid the invoice for Fiserv's Statement of Work to customize the Subpoena Workflow module for Nautilus, Fiserv's Enterprise Content Management product.  This tool was to cover a gap in the ability to perform research on large transaction data sets.

332.  Fiserv failed to deliver a workable customization.

333.  Common research queries that currently take minutes to complete take nine hours to complete on Fiserv's Nautilus Subpoena Workflow module, and Fiserv has indicated that there may not be a correction for this inadequate performance.

CORE/0838898.0039/188919190.1

334. The Nautilus Efficiency Manager is responsible for key account document processing workflows. The Nautilus Efficiency Manager was not built or ready to test for Mock 1.

335. Fiserv is contractually obligated to provide an in-house FCRM.

336. Fiserv cannot provide FCRM in-house.

337. Fiserv represented during the LOE that it could perform scans of all ACH items, which was a critical feature for GSB.

338. Fiserv is contractually obligated to provide FCRM OFAC Integration, OFAC extracts, and intraday OFAC scans of all ACH items.

339. In December 2023 and January 2024, Fiserv notified GSB that it could not perform timely scans of all ACH items. Additionally, Fiserv advised GSB that Fiserv has never been able to do this, nor should Fiserv have agreed to deliver that functionality.

340. There continues to be outstanding issues with FCRM's ability to complete OFAC scans of all ACH files in a timely manner.

341. Fiserv has materially breached the CheckFree Bill Payment and Delivery Services Schedule to ASP Services Exhibit by failing to provide a platform in which a GSB customer can make an online bill payment from their savings account.

342. Further, Fiserv's system cannot adequately convert customer's recurring payment schedules, which will result in payments being sent on incorrect days after conversion.

343. Fiserv's "Forms Vendor Interface-WKFS" does not work. Data such as Payable on Death Beneficiaries, ownership codes, and trust information is not accurately populating on critical documents such as signature cards and account agreements.

344.    Fiserv's DNA "Participation Module" for loans does not work.  Participation percentages are truncated, and trial balances and reports are invalid and unreliable.

345.    Fiserv's "Escheatment Processing" does not work.  GSB cannot escheat for a customer with a foreign address, IRA's are not considering the required minimum distributions when determining an escheatment timeline, and escheatment data cannot be exported to state escheatment systems.

346.    Fiserv has failed to fully integrate Nautilus with its Commercial Center by failing to provide deposit slip and deposited item images.

347.    Fiserv materially breached the Master Agreement and the Account Processing (DNA) Software Schedule by forcing GSB to serve as a beta tester.

348.    Fiserv's RFP Response indicated that it implements standard Quality Assurance processes "[t]o guaranty the highest quality of new releases…" and that they "…coordinate the testing at volunteer client beta sites."

349.    That has not been GSB's experience.

350.    Due to Fiserv's failure to adequately test its products, GSB has effectively and involuntarily become a beta tester.  GSB has been required to capture logs and send them to Fiserv over many months in the hope of enabling Fiserv to identify and correct errors and resolve the functional limitations of UX.

351.    Even with these logs, Fiserv has been unable to provide resolutions for the multiple errors and functionality issues with UX GSB is experiencing.

CORE/0838898.0039/188919190.1

### j.     Fiserv's use of the Termination Fee

352.     Given the myriad of issues with the DNA conversion, and the resulting risks to GSB and its customers, GSB attempted to negotiate an amicable resolution with Fiserv that would allow the parties to exit the Master Agreement and GSB to remain with its current core processor.

353.     Fiserv claimed that it had not materially breached the Master Agreement, and that if GSB terminated the Master Agreement then it was entitled to an Early Termination Fee under Section 8(d) of the Master Agreement.

354.     Fiserv contends that GSB would be required to pay a $45 million Early Termination Fee – which is $17 million dollars more than what GSB would be required to pay over the life of the Master Agreement had Fiserv fully performed because credits provided by Fiserv would need to be repaid.

## V.     Claims for Relief

### Count I
### Breach of the Master Agreement

355.     GSB incorporates each paragraph of this Complaint as if fully restated herein.

356.     GSB entered into the Master Agreement with Fiserv for numerous products and services dependent on integrations with Fiserv's DNA core processing system.

357.     GSB has, at all times, fully performed under the Master Agreement.

358.     GSB has devoted hundreds of thousands of hours of executive and associate time and resources to this project.

359.     GSB has close to 100 associates serving as DNA conversion project team members across all of GSB's business lines.  GSB has additional associates who support the conversion efforts but do not attend the Fiserv meetings.

360. GSB hired new staff to cover daily operations while experienced associates spent time supporting the DNA conversion.

361. GSB also hired Catalyst for project coverage and support, and has paid them $4.5 million as of April 8, 2024.

362. Fiserv has acknowledged that GSB is not the source or cause of the conversion delays or problems.

363. Fiserv materially breached the Master Agreement by twice failing to timely complete the DNA conversion.

364. Fiserv did not complete the DNA conversion by the contractually-agreed upon deadline of August 14, 2023.

365. Fiserv did not complete the necessary work to successfully perform a DNA conversion by May 27, 2024.

366. On January 11, 2024, Fiserv admitted that there was an unacceptable amount of risk with the May 2024 go-live date.

367. Going live on May 27, 2024, was impossible because:

    a. Material data mapping problems remained after the fifth Data Cut;

    b. Fiserv was unable to provide a working UX with tMagic;

    c. Because of Fiserv's failure to deliver a functional UX, there is not sufficient time for GSB to build procedures and a training curriculum and to train GSB retail associates;

    d. Fiserv was unable to deliver an adequate report writing solution;

    e. Fiserv was unable to deliver the contracted custom reports;

    f. Fiserv was unable to resolve project level issues for the workstreams in red to prepare for go live; and

    g. Fiserv was unable to conduct 2 Mocks prior to May 2024.

368. Fiserv's inability to go-live in May 2024 is a material breach of the Master Agreement.

50

369. Time is of the essence because GSB's contract with its current core processing provide expires on June 30, 2024.

370. Time is of the essence because GSB incurs hundreds of thousands of dollars each month in consulting fees and hours worked by GSB's associates.

371. Fiserv's inability to complete a timely conversion is due in large part to its inability to adequately staff the GSB conversion, which itself is a material breach.

372. Fiserv's unwillingness to provide GSB with the 97 items, some of which Fiserv expressly agreed to provide in the Master Agreement, is a material breach of the Master Agreement and the requirements in the Conversion Services Exhibit to the Master Agreement.

373. Fiserv has materially breached the iVue Software Schedule and has left GSB without an adequate report writing and business analytics solution in material breach of the Account Processing Software (DNA) Schedule and the Master Agreement.

374. Fiserv has materially breached the Conversion Services Exhibit by failing to provide a real-time interface between DNA and Centrix as expressly set forth in the Master Agreement.

375. Fiserv has materially breached the Conversion Services Exhibit by failing to deliver the 800 reports that GSB uses in its regular operations.

376. Fiserv has materially breached the Financial Crime Risk Management Software Schedule by failing to provide an in-house solution. Further, Fiserv's FCRM cannot scan all ACH items in the ACH files for OFAC in a timely manner, putting GSB's ability to complete daily ACH operations at risk without interjecting undue potential sanctions compliance exposure.

377. Fiserv has materially breached the Master Agreement by failing to provide a functional Currency Transaction Reporting system.

CORE/0838898.0039/188919190.1

378. Fiserv has materially breached the Master Agreement by failing to provide a root cause analysis to address the reasons why Fiserv was unable to go-live in August 2023 or May 2024.

379. Fiserv has materially breached the Master Agreement by failing to provide the Nautilus Subpoena Workflow module for Nautilus, Fiserv's Enterprise Content Management product.

380. Fiserv has materially breached the CheckFree Bill Payment and Delivery Services Schedule to ASP Services Exhibit due to its inability to provide a platform that allows a GSB customer to make online bill payments with their savings account.

381. As a highly regulated entity, GSB must have a core processing system that allows it to comply with all laws and regulations.

382. Fiserv has downplayed GSB's concerns that an unsuccessful conversion will draw the attention of its regulators. GSB's concerns are well-founded, as the Office of the Comptroller of the Currency is currently probing Comerica Bank after a poorly executed system conversion by Fiserv's largest competitor, Fidelity National Information Services.

383. GSB executives met with Fiserv executives on March 1st and March 22nd to discuss how to proceed. The parties were unable to agree to a resolution.

384. As a result, GSB terminated the Master Agreement for cause on April 24, 2024.

385. At the time of termination, Fiserv's IMS showed that only 64% of the work was completed in the 28 months since the execution of the Master Agreement.

386. At the time of termination, the following fifteen Workstreams were in "red" status: (1) Governance; (2) DNA; (3) Nautilus; (4) Architect; (5) Custom Solutions; (6) CRM/BI; (7)

CORE/0838898.0039/188919190.1

FCRM; (8) tMagic; (9) Commercial Center; (10) CheckFree SBBP; (11) CheckFree Next; (12) PEP+; (13) TCM; (14) Print Ready; and (15) Training.

387.    At the time of termination, there were 426 open cases in Client 360, with 119 open cases categorized by Fiserv as "Enhancements" that would not be completed prior to a go-live.

388.    Under Section 8(b)(i), if GSB is forced to terminate the Account Processing Software Schedule (DNA), then it can terminate all other Schedules and Exhibits to the Master Agreement.  GSB exercised its right to terminate the Master Agreement and all other Schedules and Exhibits except for the Card Processing Schedule, which will remain in place.

389.    Section 7 of the Master Agreement provides for unlimited liability for "gross negligence or willful misconduct."  As detailed in this Complaint, Fiserv has engaged in gross negligence and willful misconduct.

390.    Further, the limitation of liability in the Master Agreement, including the formula for measuring recoverable damages, is unenforceable under New York law.

391.    During the RFP process, Fiserv represented that all of its products and services were fully functional and generally available.  Fiserv knew that this was untrue at the time the statements were made.  Fiserv contracted to provide GSB with iVue in-house, yet later admitted that it could not provide iVue in any form.

392.    Fiserv represented to GSB that DNA UX was fully tested and generally available to clients, and that DNA UX was compatible with tMagic.

393.    Fiserv never provided a functional DNA UX to GSB, and tMagic proved to be incompatible with DNA UX.  Fiserv also provided misleading, if not outright false, responses on which clients have been able to use UX and tMagic together.

394. Fiserv was unable or unwilling to adequately staff the GSB conversion project. Contractually-required positions went unfilled for months, which caused numerous delays and inefficiencies.

395. The understaffing was so prevalent and material that a Fiserv project manager indicated that he would recuse himself from the project if it continued to be understaffed.

396. As a result of Fiserv's gross negligence and willful misconduct, GSB has suffered damages in the form of consulting fees, fees paid to Fiserv, GSB associate time, third-party contract renewals and extensions, and fees paid to Jack Henry & Associates.

397. While the totality of GSB's damages will be proven at trial, GSB's damages exceed $12 million.

398. GSB also seeks an award of its reasonable costs and expenses, including its attorneys' fees and expert witness fees, pursuant to Section 12(i) of the Master Agreement.

## Count II
## Fraud

399. GSB incorporates each paragraph of this Complaint as if fully restated herein.

400. To induce GSB into executing the Master Agreement, Fiserv knowingly made affirmative false and misleading statements and fraudulently omitted and concealed material facts.

    a. Fiserv falsely represented that "[a]ll functionality referenced in this [RFP] response is generally available (not beta), unless specifically noted in any given response."

    b. Fiserv falsely represented that an in-house conversion would accommodate all of the surrounding products and processes that Fiserv marketed during the RFP and LOE periods;

    c. Fiserv intentionally omitted the fact that DNA Standard was the only DNA user interface that was operational;

    d. Fiserv falsely represented that its DNA UX was fully tested and generally available to the public;

CORE/0838898.0039/188919190.1

e.  Fiserv falsely represented that DNA UX was built for retail operations;

f.  Fiserv falsely represented that DNA UX was compatible with tMagic;

g.  Fiserv falsely represented that it could provide GSB with an in-house iVue product;

h.  Fiserv falsely represented that it could provide GSB with a fully-functional in-house FCRM product;

i.  Fiserv falsely represented that all ACH items could be scanned for OFAC;

j.  Fiserv falsely represented that it could provide a real-time interface between Centrix and DNA;

k.  Fiserv falsely represented that it would not force GSB to act as a beta tester;

l.  Fiserv falsely represented that it would follow the detailed testing procedures outlined in its RFP Response;

m.  Fiserv falsely represented that it would complete the DNA conversion in eighteen months; and

n.  Fiserv falsely represented that it would fully staff the DNA conversion project.

401.  Each of these statements and representations were knowingly, intentionally, and demonstrably false when they were made.

402.  Fiserv represented that all of the products and solutions in the Master Agreement were fully tested, fully operational, no longer needed beta testing, and were in use by other clients. Fiserv knew this representation was false.

403.  As of March 1, 2024, the following products and solutions are unavailable and still being developed by Fiserv – more than two years after the Master Agreement was signed:

a.  UX for use by retail associates is inoperable and still under development;

b.  tMagic cannot be integrated with UX and they are incompatible;

c.  An in-house iVue data warehouse and report-writing product;

d.  A fully functional FCRM is not available as an in-house solution; and

e.  There is no real-time interface between DNA and Centrix.

55

404.    Fiserv knew that these products and solutions in the Master Agreement were not fully tested, were not fully operational, and needed beta testing. Thus, Fiserv had knowledge of the falsity of the facts in their misleading statements and/or omissions and/or concealments.

405.    Fiserv represented that its Quality Assurance processes "coordinate(s) the testing at volunteer client beta sites." Fiserv knew this was untrue, as it has involuntarily forced GSB to act as a beta site for UX by capturing logs and providing them to Fiserv to identify and correct errors and resolve functional limitations.

406.    Additionally, beta testers for new products or solutions, such as a new user interface, must work with Fiserv to identify and fix all the problems and issues that arise when the user interface is active for the first time.

407.    Serving as a beta tester is a material burden, and core process providers often pay substantial amounts of money to financial institutions to serve as beta testers.

408.    GSB did not want to serve as a beta tester for any product or solution, and Fiserv represented that the products and solutions in the Master Agreement were fully tested and operational.

409.    Fiserv's statement was knowingly false and was made to induce GSB to enter into the Master Agreement.

410.    Upon information and belief, no other financial institution had converted to DNA with UX as of December 31, 2023. If Fiserv had been able to finish GSB's conversion project, then GSB would have involuntarily and unknowingly been forced to act as a beta tester for UX.

411.    GSB had no means available to determine the falsity of the statements or to discover the omissions and concealment.

CORE/0838898.0039/188919190.1

412. Fiserv intended for GSB to rely upon their statements, omissions, and concealment. These statements were made to induce GSB to select Fiserv as its next core processing provider.

413. GSB materially relied upon the statements, omissions, and concealment by entering into the Master Agreement, which GSB would not have done if Fiserv had been honest about the products and services it was capable of providing.

414. GSB's reliance was justifiable and reasonable.

415. GSB lacked knowledge that Fiserv's statements were false.

416. As a direct and proximate result of Fiserv's misleading statements and/or omissions, GSB was damaged.

417. GSB has suffered damages in the form of consulting fees, fees paid to Fiserv, GSB associate time, third-party contract renewals and extensions, and fees paid to Jack Henry & Associates.

## Count III
## Negligent Misrepresentation

418. GSB incorporates each paragraph of this Complaint as if fully restated herein.

419. Fiserv made representations and/or omissions to GSB of material facts concerning the DNA conversion.

420. Fiserv represented that all of the products and solutions in the Master Agreement were fully tested, fully operational, and no longer needed beta testing. Fiserv knew this representation was false.

421. As of March 1, 2024, the following products and solutions are unavailable and still being developed by Fiserv – more than two years after the Master Agreement was signed:

    a. UX is inoperable and still under development;

    b. UX and tMagic are incompatible;

c.  iVue is completely unavailable in any form;

d.  FCRM is not available as an in-house solution;

e.  All ACH items cannot be scanned for OFAC in a timely manner; and

f.  There is no real-time interface between DNA and Centrix.

422.   Fiserv knew that these products and solutions in the Master Agreement were not fully tested, were not fully operational, and needed beta testing.  Thus, Fiserv had knowledge of the falsity of the facts in their misleading statements and/or omissions and/or concealments.

423.   Fiserv represented that its Quality Assurance processes "coordinate(s) the testing at volunteer client beta sites."  Fiserv knew this was not true, as GSB has been involuntarily required to act as a beta site for UX by capturing logs and providing them to Fiserv to identify and correct errors and resolve functional limitations.

424.   Further, Fiserv intentionally omitted the fact that DNA Standard was the only DNA user interface that was operational with DNA, and represented to GSB that UX was the only user interface for DNA retail operations.

425.   Fiserv owed GSB a duty to conduct the DNA conversion according to its representations.

426.   Fiserv breached its duty owed to GSB by failing to conduct the DNA conversion according to its representations.

427.   Fiserv failed to act with reasonable care in making the above-mentioned representations and/or omissions concerning the DNA conversion.  Fiserv made the above-mentioned representations and/or omissions concerning the DNA conversion without reasonable grounds for believing them to be true.

58

428. Fiserv made the above-mentioned representations and/or omissions with the intent to induce GSB to entering into the Master Agreement.

429. Fiserv knew, or should have known, that GSB had no information regarding the truth of its statements regarding the DNA conversion, and that GSB would reasonably rely upon Fiserv's representations and/or omissions.

430. GSB justifiably and reasonably relied on Fiserv's representations and omissions. GSB would not have entered into the Master Agreement without such statements or omissions by Fiserv.

431. As a result of Fiserv's acts and/or omissions, GSB has been damaged and harmed by Fiserv.

432. GSB has suffered damages in the form of consulting fees, fees paid to Fiserv, GSB associate time, third-party contract renewals and extensions, and fees paid to Jack Henry & Associates.

## Count IV
## Declaratory Judgment under 28 U.S.C. § 2201

433. GSB incorporates each paragraph of this Complaint as if fully restated herein.

434. The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, provides a remedy for parties where an actual dispute exists but the controversy has not yet matured to the point where an action for damages at law has been filed.

435. Contract law has long distinguished between liquidated damages, which are enforceable, and penalty clauses, which are not.

436. A liquidated damages provision is an estimate made by the parties at the time of their agreement of the extent of an injury that would be sustained upon the breach of the contract.

CORE/0838898.0039/188919190.1

437.    If the amount fixed, however, is plainly or grossly disproportionate to the probable loss, then the provision is a penalty clause and will not be enforced.

438.    A penalty clause is unenforceable because a party to the contract should not be compelled to continue performance out of fear of economic devastation.  In other words, a penalty clause discourages efficient breaches by raising the cost of a breach to the contract-breaker.

439.    Fiserv's Termination Fee is a penalty.  The purpose of the Termination Fee is to deter competition by preventing parties such as GSB from switching to other core processing providers upon Fiserv's material breach.

440.    Enforcement of the Termination Fee would allow Fiserv to profit from fraudulently inducing GSB to entering into the Master Agreement.

441.    Further, Fiserv's Termination Fee is a penalty because it creates the perverse incentive to pursue a breach of contract claim rather than fully perform in order to realize a greater profit without expending resources.

442.    Fiserv uses a deliberately architected approach with "flex credits" to create an inflated termination fee in an attempt to trap GSB in the contract and excuse Fiserv's nonperformance.

443.    The enforcement of the Termination Fee will produce a windfall to Fiserv, as it will receive 90% of all contractual payments, plus a payment of $13 million in voided flex credits, and saved time, effort, and expenses in not performing under the Master Agreement.

444.    It is immaterial whether the parties' agreement labels the provision as liquidated damages.

CORE/0838898.0039/188919190.1

445. GSB's declaratory relief is forward looking and addresses a controversy before it has developed into a violation of law or breach of contractual duty. GSB's declaratory relief will prevent the accrual of avoidable damages.

446. GSB is seeking clarification as to the legal relations at issue between the parties and to settle a controversy before a legal breach of duty or contract. GSB's requested declaratory relief will lead to a change in behavior by the parties to conform their behavior to the law or to minimize the danger of future monetary loss by the parties.

447. Fiserv accused GSB in writing of seeking to portray a termination for convenience as a termination for cause to "avoid the resulting early termination fees required by Section 8(d) of the Master Agreement."

448. The dispute between the parties is real; it is not conjectural, hypothetical, or contingent. Fiserv contends that the Termination Fee is approximately $45 million. GSB contends that the Termination Fee is an unenforceable penalty. Thus, there is a definite and concrete dispute between the parties concerning the validity and enforceability of the Termination Fee.

449. Declaratory judgment is necessary and proper to determine the rights, obligations, and liabilities of the parties.

450. GSB has no adequate alternative remedy at law.

451. The requested declaratory judgment is prospective looking, as it would assist the parties in determining how to proceed under the Master Agreement.

452. The requested declaratory judgment would serve a useful purpose in clarifying or settling the legal issue of the enforceability of the Termination Fee.

453. The requested declaratory judgment would finalize this controversy and offer the parties relief from uncertainty.

CORE/0838898.0039/188919190.1

## VI.    Prayer for Relief

WHEREFORE, Plaintiff Great Southern Bank requests that this Court grant the following relief:

(a)    Finding Fiserv liable to Great Southern Bank for contract damages in such amount(s) as the Court or jury may determine;

(b)    Finding Fiserv liable to Great Southern Bank for tort damages in such amount(s) as the Court or jury may determine;

(c)    Issue a declaratory judgment that Great Southern Bank's termination was for cause and there is no basis for an Early Termination Fee in the Master Agreement;

(d)    Issue a declaratory judgment that the Early Termination Fee in the Master Agreement is a penalty and unenforceable;

(e) Award Plaintiff Great Southern Bank its reasonable costs and expenses, including its attorneys' fees and expert witness fees, pursuant to Section 12(i) of the Master Agreement and/or 28 U.S.C. § 2202; and

(f) All such other and further relief as the Court deems just and proper.

Respectfully submitted,

STINSON LLP

*/s/ George F. Verschelden*
Douglas R. Dalgleish MO Bar #35203
George F. Verschelden   MO Bar #55128
1201 Walnut, Suite 2900
Kansas City, MO 64106-2150
Tel. (816) 842-8600
Fax (816) 691-3495
Doug.dalgleish@stinson.com
george.verschelden@stinson.com

ATTORNEYS FOR PLAINTIFF GREAT
SOUTHERN BANK

CORE/0838898.0039/188919190.1